UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) EL NACIONAL DE OKLAHOMA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-14-728-D |
| | ) | |
| 1) TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**EXHIBIT 4**

---

ORAL DEPOSITION OF

TOM IRMITER

January 20, 2016

---

ORAL DEPOSITION OF TOM IRMITER, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on January 20, 2016, from 9:34 a.m. to 3:51 p.m., before TAMI A. ADAMS, CSR in and for the State of Texas, reported by machine shorthand, at the offices of The Voss Law Firm, P.C., 26619 Interstate 45 South, The Woodlands, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record herein or attached hereto.

Page 110

1  MR. McCLENNY: Objection. Form.
2  A. Not that I'm aware of as we sit here today.
3  Q. (BY MR. PFANSTIEL) All right. So --
4  (Brief interruption at the door)
5  MR. PFANSTIEL: Are those the -- Is that
6  the CV?
7  MR. McCLENNY: That you asked for an
8  amended copy. And it is 16, 17 -- Yeah. (Handing
9  document.)
10  MR. PFANSTIEL: We are replacing
11  Exhibit 11 with a -- with a new exhibit we just
12  received, which is the updated --
13  MR. McCLENNY: You can set --
14  MR. PFANSTIEL: -- complete CV.
15  MR. McCLENNY: You can set it to the side.
16  THE WITNESS: Yeah.
17  MR. McCLENNY: Put it in later.
18  A. What section was that; do you remember?
19  Q. (BY MR. PFANSTIEL) Eleven.
20  A. Oh, 11. Here we go. So you want to have her
21  make a new stamp --
22  Q. Yeah, let's do that.
23  A. -- and just get it done now? Otherwise, we'll
24  forget.
25  (Exhibit 11 re-marked, and brief

Page 111

1  discussion off the record)
2  Q. (BY MR. PFANSTIEL) All right. So,
3  Mr. Irmiter, what was your project on this case?
4  A. What was the scope of the project?
5  Q. Yes, sir.
6  A. To determine whether or not the property was
7  damaged by a storm event on or around May 31st, 2013, to
8  determine what the extent of that damage was, and to
9  determine the scope of repair.
10  Q. When were you hired?
11  A. Shortly before the inspection. I believe we
12  covered our retainer agreement, and it would have been
13  shortly after that was executed. And that document was
14  executed on 7-2, 2015, and --
15  MR. McCLENNY: That's Exhibit 6.
16  A. -- my inspection occurred on June 8th, 2015.
17  So I inspected it on June 8th, and that's,
18  approximately, when we were retained. We sent out an
19  agreement on the 2nd. They got back to us after the
20  inspection.
21  Q. (BY MR. PFANSTIEL) Okay.
22  A. Yeah.
23  Q. Fair to say that you've inspected the property
24  two years -- over two years after the alleged date of
25  loss?

Page 112

1  A. Yes.
2  Q. Is it common for you to inspect a property that
3  long after a loss?
4  A. Yes. We've inspected them up to six years
5  later.
6  Q. Would you agree with me that the closer in time
7  to a loss that you inspect a property, the -- the better
8  you're able to do as far as --
9  MR. McCLENNY: Objection. Form. Sorry.
10  Q. (BY MR. PFANSTIEL) -- forming opinions as to
11  damage and cause of loss?
12  MR. McCLENNY: Same objection.
13  A. Closer is better, but it's not always
14  necessary.
15  Q. (BY MR. PFANSTIEL) All things being equal,
16  would you say it's better to inspect a property closer
17  to the date of loss or farther away from the date of
18  loss?
19  MR. McCLENNY: Same objection.
20  A. You know, I -- we don't ever get to inspect
21  them close to the date of loss, so ...
22  Q. (BY MR. PFANSTIEL) Well --
23  A. I mean, seriously, the closest that I have
24  inspected a property in the last five years to the date
25  of loss is probably some of the Joplin tornados, and

Page 113

1  even that was six months after the tornados. So a lot
2  of times, we are brought in a year to 18 months after
3  the event.
4  Q. I understand that.
5  A. Yeah.
6  Q. What I -- My question's a little different.
7  It's -- Wouldn't you find it more advantageous, from an
8  inspection standpoint, to actually inspect the property
9  closer to the date of loss --
10  MR. McCLENNY: Objection. Form.
11  Q. (BY MR. PFANSTIEL) -- than farther away?
12  A. Actually, in a lot of cases, no. It benefits
13  us. When you have -- particularly on low-sloped roofs.
14  Because -- Well, even on shingled roofs. Sometimes, the
15  failure mechanism that occurs is latent. The roof can
16  be leaking after the event; but because of the way that
17  the roof deck is constructed, the thickness of the roof-
18  deck insulation, you may not discover the leaking
19  activities, or the intensity of the leaking, sometimes
20  until six months, eight months, a year later.
21  What's important in that situation is to
22  interview the stakeholders. And that's covered in the
23  ASTM document that we discussed earlier. That's one of
24  the keys to that document, is you need to get service
25  history on the building, which I did. I met both with

**114**

the building owner and I believe his sister and had a lengthy discussion when I first got there.
   We walked around the building. I'm looking -- Right as I come in the door, on the right side, you can -- And I have pictures of this -- you can see water damage. You can see water damage on the ceiling. My first question is, "Tell me about this. When did this occur? Has this been ongoing?" You know.
   Q. Well --
   A. Those kinds of things are very important to establish a timeline.
   Q. Okay. So is it your testimony today --
   A. (Nodding head.)
   Q. -- that you would prefer to inspect a property two years after the loss or closer in time to the loss?
      MR. McCLENNY: Objection. Form.
   A. Doesn't make a difference.
   Q. (BY MR. PFANSTIEL) Doesn't make a difference --
   A. Does not make a difference. No.
   Q. So there is no advantage, in your opinion, to inspecting a loss close -- right after it happens as opposed to two years later.
   A. No. I don't believe there is. And, in fact, there are some advantages to inspecting it later than

**115**

sooner.
   Q. Okay.
   A. As I discussed.
   Q. Okay.
   A. Yeah.
   Q. So, actually, it's better to inspect it later than sooner.
   A. In some instances, yes.
   Q. How about here in this case?
   A. I believe so. I actually believe that -- And we talk about this -- that the -- the leaking that began to occur after this event, based on information provided to us by the building owners and the building occupants, had progressed a great deal in that two-year period. That would be very consistent with a roof that has had a catastrophic failure and how that failure presents itself over a time continuum as opposed to immediately.
   Q. Okay.
   A. Yeah.
   Q. So what I'm hearing you say is damages can manifest themselves over time.
   A. Yes. They present themselves over time.
      The -- And the problem is, is that the -- often what's misdiagnosed on low-sloped roofs after an event like this is the created openings that result from

**116**

the storm, which are the entrance point for water, are not co-located to the exit point. You can have the entrance point here, and you can have the exit point 30 feet away on the inside, depending on the roof deck, the roof slope, openings in the roof deck, which when I was able to, I was able to photograph, you know, different cuts and openings and things in that -- in that slab. And so it made very clear sense as to why the leaking was occurring the way it was and how it was finding its way into the building.
   That wouldn't show necessarily as completely on the day of the storm. That doesn't mean that the water wasn't there on top of that concrete deck. And so the scope of repair might, in fact, be diminished incorrectly if you're diagnosing too quickly.
   Q. Okay. So --
   A. Yeah.
   Q. So if I'm understanding you correctly, it's -- you're in a better position to judge the scope of damage and the cause of damage out two years than -- than, say, Mr. Watson was, closer in time to the loss.
      MR. McCLENNY: Objection. Form.
   A. Yeah. There's -- I -- Yeah, I believe so. I guess I would liken it to kind of like a whiplash. Whiplash, you know, sometimes doesn't evidence itself

**117**

immediately in terms of the damages that you might have to your neck or your back or something like that. I know that, having been through one of those.
   Q. (BY MR. PFANSTIEL) Well, but the hail fractures to a roof membrane would be more evident closer in time, would they not?
   A. Not necessarily.
   Q. Does that --
   A. But they'll be -- they'll be no less evident two years later.
   Q. What if you had intervening hailstorms in the intervening two years; how does that play into it?
   A. We see that all the time. Absolutely.
   Q. What do you do to determine whether a hail strike you see occurred two years ago or from the intervening storm?
   A. Well, as I said before, I would have been -- I -- This -- This project would have given me more concern about intervening hailstorms --
   Q. Uh-huh.
   A. -- had my questions to the building owners, when I asked them about the pattern of leaking, had they said, "Yeah, we had this event, and boy, you know what? It just started leaking three weeks before you got here." Then I would have been concerned. I would have

118

1  been calling this law firm, and I would -- that retained
2  us, and I would have been saying to them, "Guys, you
3  know, we have the wrong" -- "we have a different storm
4  date. We have things occurring as a result of a new
5  storm."
6      But because I had very believable -- I
7  don't know why they would want to lie. Didn't make
8  sense that they would. I always trust the people I'm
9  working with. They seem reasonable. I had very good
10 documentation from them that this is what occurred, and
11 it's gotten progressively worse. And so the damage had
12 already occurred. So I, really, don't care if there's
13 additional storm damage at that point in time.
14    Q. Okay. So --
15    A. Yeah.
16    Q. -- you had talked to who?
17    A. The -- And, again, I'm not going to have the
18 name of the guy, but the owner. The guy who owns the
19 newspaper.
20    Q. Okay.
21    A. Yeah. And his -- I talked to him. I talked to
22 his sister, I believe.
23    Q. And what did -- what did you -- what did he
24 tell you?
25    A. Well, I said, "Tell me about the" -- "Tell me

119

1  about" -- I said, "I'm looking at these pictures of
2  these roofs that have been published in reports and
3  stuff that we pulled up, and I'm looking at Google Earth
4  and pictorial pictures; and I'm seeing this roof that's
5  got this varying degrees of white coating on there. And
6  so my first question to you is, 'Why are you putting the
7  white coating on there?'"
8      Because intuitively, what I would be
9  thinking, based on my education and experience, is
10 you're putting the white coating on there because it's
11 leaking. Right?
12     And by the way, I said, "Did anybody else
13 interview you?" They said, "No. You're the first guy
14 to interview me. The other engineers that were here for
15 the insurance company didn't sit down and talk to me
16 about this." And to me, that's essential to evaluating
17 a claim like this in terms of causation.
18     And he said -- I said, "So why did you put
19 it on there?" Said, "Oh. To save energy."
20     "So you put the white" --
21     "Yeah. I put the white stuff on there,
22 and we would put it on as it wore out, because of energy
23 cost. We thought it was a way to reflect the sun and
24 save energy."
25     So I said, "So you weren't putting it on

120

1  there because of leaking." He said, "No. This roof
2  wasn't leaking before the storm hit."
3      That's pretty important information. I
4  would have liked to have seen that in the report from
5  the other engineers, but they didn't -- they didn't
6  comment on any of that stuff. They just automatically
7  assumed that the reason the white coating was on there
8  was because the leak -- roof was previously leaking, and
9  that's not the case.
10    Q. Oh.
11    A. Yeah.
12    Q. So what did you do to confirm what -- what the
13 building owner told you?
14    A. Saw a couple of buckets, in the back, of the
15 white coating, and took him at his word.
16    Q. Did you talk to any of the tenants?
17    A. The tenants -- I talked to the people on the
18 right side of the building. I think it's a nonprofit --
19 I want to say something to do with welfare or something
20 like that -- office. I walked through there. I talked
21 with them. They had counseling sessions going on. I
22 said, "Can I take a look?" I said, "Are you guys having
23 leaking?" They said, "No, not right now, we're not
24 having any leaking."
25     "Have you had leaking?"

121

1      "Yes, we've had leaking."
2      "Has it been going on forever?"
3      "No. It started a few years ago."
4    Q. Okay.
5    A. Okay.
6    Q. So -- But you don't remember who this was that
7  you talked to?
8    A. No. You can -- It's a -- It's a health service
9  that's part of the building.
10     Then there's a middle part of the building
11 that I couldn't get access to. It was closed that day.
12   Q. So did -- Okay. So -- Do you have notes of who
13 you talked to?
14   A. If I have them, I would have produced them to
15 you.
16   Q. Okay.
17   A. Yeah.
18   Q. So I'll -- I'll represent to you that you
19 didn't produce any notes.
20   A. Yeah. Typically, any field notes are forwarded
21 into. So I would have taken field notes, for example,
22 for Section 2.3, which are the roof cores, the actual
23 measurements in the roof cores; and those would have
24 been in my logbook. I would have taken field notes
25 about ceiling stains, and I would have taken

126

1  leaking?
2    Q. (BY MR. PFANSTIEL) Right.
3    A. What compromised it?
4    Q. So --
5    A. That's, really, the big question.
6    Q. Okay. So what --
7    A. Yeah.
8    Q. -- what I -- Okay. So you believe the roof
9  began leaking after the storm, because that's what the
10 owner told you.
11   A. Yes.
12   Q. What did you do to determine the cause of the
13 leak?
14   A. Well, first of all, what I did is, I inspected
15 the interior of the building and documented water-
16 infiltration areas that were visible to the naked eye
17 and the camera.
18      I then, on two different occasions, used
19 an infrared camera to look for anomalies in those
20 locations, and took documentations of anomalies.
21      I then got up on the roof, and I walked
22 the entire roof two different days in, essentially, two-
23 foot increments, from left to right on the first day and
24 from back to front on the second day. So I'm -- I'm
25 really getting a chance to look at this roof completely.

127

1       I spent time using a infrared camera and a
2  Tramex meter to triangulate potential water that was in
3  the roof system itself.
4       I performed some core cuts to determine
5  how many layers of roof were on there and to determine
6  the -- if it was wet, if, in fact, the triangulation was
7  correct.
8       And then I spent time both days looking
9  for physical damage to air-conditioning units, soft
10 metals, parapet wall caps. There's two types. One,
11 there's a metal cap; and there's a clay tile cap.
12      And then I spent time physically on my
13 hands and knees for a couple of hours very closely
14 looking at and tactilely feeling for impact damage
15 typically caused by hail.
16   Q. Okay.
17   A. It was fairly thorough, I think, investigation.
18   Q. Sure.
19   A. Yeah.
20   Q. So what -- when you say you're inspecting
21 the -- the soft metals, you found some hail?
22   A. Yes.
23   Q. You found a hail hit to the clay tile?
24   A. I think about eight or ten, yeah.
25   Q. How -- How -- How would you -- How could you

128

1  determine that was from the 2013 storm and not the 2015
2  storm?
3    A. The -- I couldn't necessarily determine that,
4  at that point in time.
5    Q. Were you able --
6    A. Yeah.
7    Q. Were you able to later determine that?
8    A. No. No. That would be difficult. I mean, it
9  certainly was in that spot of those two. It certainly
10 wasn't from a 2'7, 2'08, something like that, event.
11      The -- The exposed surfaces were fairly
12 clean. I mean, they weren't aged. They weren't
13 polluted. They looked fairly clean.
14   Q. So that would --
15   A. So ...
16   Q. -- indicate a new --
17   A. Something within a couple of years, yeah.
18   Q. Okay. So -- So -- And you -- you went and
19 looked for hail marks on -- on the roof membrane itself?
20   A. Yeah. And particularly in the areas that had
21 been coated, I was looking for what we call hail shocks.
22 And that leaves a -- Where it hits, it kind of leaves a
23 nice, you know, circle, circle, circle, kind of shock
24 mark. And I found, you know, some of those.
25      I looked at delamination of the surface,

129

1  where it chipped off parts of the surface.
2       It's interesting now because what you have
3  shared with me today sheds some light on part of my
4  investigation. Because based on the age of the
5  building, when we pulled up the County records, I
6  anticipated seeing multiple layers of roofing on here.
7  And, I mean, it was, you know, one layer. So that now
8  makes sense as to why I wasn't seeing multiple layers,
9  since the roof had been redone in '07.
10   Q. So --
11   A. Yeah.
12   Q. -- when you say single layer, is that -- is
13 that like a one ply, or how -- how do you --
14   A. Well, it's a built-up roof. But on buildings
15 of this age, we typically see the first roof. Then we
16 see some scarification. We might see another one.
17      We cut one in Dallas yesterday. My guys
18 told me they had five different layers of roofing on
19 there that was about nine inches thick.
20      You know, this was a nice, you know, inch
21 and a half, indicating that it's -- it's a single
22 application at this point.
23      And so what I found interesting in reading
24 the Vertex report when I saw that -- And this now starts
25 to make sense -- is that I expected the condition of

33 (Pages 126 to 129)

Case 5:14-cv-00728-D   Document 71-4   Filed 03/03/16   Page 6 of 8

Tom Irmiter

### Page 170

1  A. Yes, I do. Absolutely.
2  Q. Okay.
3  A. Yeah. Oh, absolutely.
4  Q. Why is that?
5  A. Well, there's -- there's water damage. I mean,
6  the roof is leaking. It's clearly --
7      And -- And again, I'm not a -- I have not
8  been asked as a -- to be a policy expert on this. Okay?
9  But I'm familiar enough with insurance policies to know
10 that one of the covered losses is water damage that
11 occurs on the interior.
12     So if I was given that assignment by the
13 insurance company, I would certainly want to not only
14 eliminate the possibility of hail, but I'd also want to
15 eliminate, why is the water getting in? Because there
16 may be an underlying claim for the interior repair work.
17     We have lots of claims over the years
18 where a roof isn't paid for, but the ensuing loss on the
19 inside is. And so I don't know what his assignment was.
20     We don't look at policies. We're not
21 hired to evaluate policies. We don't go with that in
22 mind. But again, I don't know what his assignment was.
23 Q. Okay.
24 A. But typically, you would want -- I certainly,
25 and as a firm, we certainly want to figure all that out

### Page 171

1  before we leave the site.
2  Q. Okay.
3  A. Yeah. Let's see. These are all core pictures
4  that go all the way to page 93. Yeah. And I think
5  that's it, that I have. Yeah.
6  Q. Okay. And --
7  A. Oh, I -- the -- I'd like to comment on page --
8  on Figures 111 through --
9  Q. Well, before we go there --
10 A. Okay.
11 Q. -- real quick, 107, is that a hail bruise?
12 What is that?
13 A. Yes. It's a hail shock.
14 Q. Hail shock.
15 A. Right in the center of it.
16 Q. Okay. And then 108?
17 A. Displaced material caused by hail, in my
18 opinion.
19 Q. Okay. But you -- you'd agree with me that when
20 a flood coat like this alligator cracks, it becomes
21 brittle. Right?
22 A. Oh, yeah.
23 Q. Can -- Can that material be displaced by a
24 flood trap?
25 A. On a roof that's about 30 years old, yeah; but

### Page 172

1  on a roof that was in 2007, no.
2  Q. Have you ever seen a six-year-old roof with
3  this kind of alligator cracking on it?
4  A. All the time, yeah.
5  Q. Is that primarily because they don't provide UV
6  protection on them?
7  A. Correct.
8  Q. So they -- you should either put some kind of
9  elastomeric coating or a ballast or something on it?
10     MR. McCLENNY: Objection. Form.
11 A. You -- You can. It's -- Depends on the -- the
12 installer. It depends on the products they're using.
13 Q. (BY MR. PFANSTIEL) Okay.
14 A. Is this the first UV -- or is this the first
15 uncoated built-up roof that I've seen alligator? No.
16 I've seen alligatoring on every built-up roof I've ever
17 looked at.
18 Q. Okay.
19 A. That's a pretty common phenomena.
20 Q. That does not have the UV coating on it.
21 A. I've seen it with UV coating --
22 Q. Okay.
23 A. -- as well. Absolutely.
24 Q. Oh. And earlier, you had mentioned something
25 to the effect of when you heard that he had put

### Page 173

1  elastomeric coating on this roof, that you'd expected
2  that was because it was leaking; and you were surprised
3  when he told you it was to reflect the sun away?
4  A. Yes.
5     MR. McCLENNY: Objection.
6  A. For U--
7     MR. McCLENNY: Form.
8  A. For UV and for energy -- energy reasons --
9  Q. (BY MR. PFANSTIEL) Okay.
10 A. -- is what he was indicating.
11 Q. Does that indicate -- Is it common -- In your
12 experience and over the years you've been doing this, is
13 it common for alligator cracking to cause leaks?
14 A. No. Historically, we don't see that. Again,
15 the reason we don't is because we would see catastrophic
16 failure if that were the case.
17     I mean, there's millions of inches of
18 cracks on this roof from alligatoring. Yeah.
19 Q. Right.
20 A. So --
21 Q. Well, maybe not all of the millions of inches
22 are leaking yet.
23 A. Maybe, they're not. But I certainly feel like
24 the correlations that I was able to meet -- make between
25 impact locations and section loss of material and

44 (Pages 170 to 173)

Southwest Reporting & Video Service, Inc.   Registration #189
713-650-1800                                swreptproduction@swreporting.com

174

1  downward slope leaking seems reasonable.
2  Q. Okay.
3  A. Yeah.
4  Q. Well, you -- you found downward slope leaking
5  in how many locations?
6  A. Not all over. Yeah. Didn't find it all over.
7  Q. No. In how many?
8  A. Oh, I'd have to look back on the infrareds
9  and --
10 Q. Oh, from --
11 A. Yeah.
12 Q. -- the infrared.
13 A. Yeah, from the infrared.
14 Q. So was infrared, is that a -- is that a
15 reliable way to check moisture levels?
16 A. Depends on your training.
17 Q. Okay. In your training, is it reliable?
18 A. Well, I was trained by the U.S. Department of
19 Energy, back in 1984, to use infrared. Feel like it's
20 very -- Yeah, I --
21 Q. Okay. It's reliable in your hands.
22 A. Yes, absolutely. I've actually been --
23 Q. Okay. Because --
24 A. Yeah.
25 Q. The reason I'm asking --

175

1  A. Yeah.
2  Q. -- is because you didn't -- in your infrared
3  pictures, you -- or your photos, you say, "infrared
4  photo showing anomaly."
5  A. Right.
6  Q. You don't say, "showing moisture."
7  A. It doesn't show moisture.
8  Q. Okay. So -- Okay. How does that work?
9  A. That would be -- Somebody's out there telling
10 you that they can find moisture or mold or anything like
11 that with an infrared camera, they don't know what
12 they're talking about.
13       Number 1 -- Number 1, to use an infrared
14 camera, you need to know how the building is
15 constructed. If I'm going to shoot the infrared camera
16 on that wall behind her -- All right -- I've got to
17 know, darn well, there's probably 16-inch studs on
18 center. I may find an old header in there from a door.
19 I need to know why -- what that is. I need to know that
20 it's a header that I'm looking at.
21       So you know all you need to know how the
22 building's constructed, so you know what you're looking
23 at. Not unlike a doctor looking at an x-ray.
24       Then you need to be able to understand
25 what anomaly -- what anomalies look like. What should I

176

1  see in that wall? This is an interior wall.
2  Q. Uh-huh.
3  A. I should see nothing in that wall. I should
4  see a nice clean orange screen on that wall.
5       The wall behind you, I'll probably see
6  some purples and some oranges; and below the window, if
7  it's leaking, I'll probably see a plume, indicating
8  potential -- an anomaly consistent with water intrusion.
9  That's the first step.
10 Q. Was infrared -- it's measuring heat. Right?
11 A. Measuring heat. Absolutely.
12 Q. So it's not measuring water. It's measuring
13 heat.
14 A. Measuring heat. So --
15 Q. So how did you -- But you just said -- I may
16 have misunderstood you. But we were -- I asked you
17 about you had checked, you know, downward wetness.
18 A. Yeah.
19 Q. And you said you checked it with infrared.
20 A. Yeah.
21 Q. And that indicated to you that it was wet.
22 A. No. That's not what I said.
23 Q. Oh, okay.
24 A. No. I --
25 Q. I misunderstood.

177

1  A. I indicated that -- I indicated that I found
2  numerous anomaly locations on the roof.
3  Q. Okay.
4  A. Numerous anomaly locations. Then I took a
5  Tramex moisture meter at those anomaly locations, after
6  I had calibrated for dry.
7  Q. Okay.
8  A. And moved it to the -- I mean, I've got the
9  infrared camera running. I set it on the roof, and I
10 move -- move the infrared -- move the meter to an
11 anomaly location.
12 Q. Right.
13 A. The meter pegs out at eighty to a hundred
14 percent. I have pictures of the infrared and the meter
15 in the infrared picture. That's what I was doing to
16 moisture map.
17 Q. Okay. So --
18 A. So I'm using two points of correlation.
19 Q. Okay. So when you're using -- Okay. So you're
20 using infrared and Tramex. And -- And together --
21 A. And I also put the infrared on the Tramex at
22 the locations that I was hitting 18 to 20 percent. And
23 guess what? There's no anomaly.
24 Q. Okay. Okay. All right. Is there, like, a --
25 a standard methodology or procedure, you know, resource

### Page 194

1  and placed a bunch of orange cones on things that she
2  thought was hail damage, and then they relied on that to
3  formulate their opinion, that would be a terrible thing
4  to do.
5  Q. (BY MR. PFANSTIEL) But -- But, I guess, I'm --
6  I guess what I'm getting at is, what's -- what's the
7  basis of your opinion that he did not perform an
8  investigation other than looking at the orange cones?
9  A. There's no other data, in his report,
10 indicating that he did. There's nothing else, in his
11 report, indicating that he did anything other than that.
12 Q. Oh. So you don't think that he inspected the
13 roof?
14 A. I think he inspected the roof. There's no
15 indication that he gathered any additional data
16 regarding damage to the roof, other than where the cones
17 were placed.
18 Q. Okay.
19 A. Yeah.
20 Q. Because he didn't find hail damage.
21 A. Well ...
22 Q. Okay. All right. So what you're saying, if
23 all he did was just go to the orange cones, that
24 would -- he wouldn't have been doing his job.
25 A. Correct.

### Page 195

1  Q. Okay.
2  A. What are the odds we could take a break for
3  bathroom here?
4  Q. Sure. That's fine.
5      MR. McCLENNY: Absolutely.
6      (Recess from 1:36 p.m. to 1:50 p.m.)
7      MR. PFANSTIEL: Can we go back on?
8      MR. McCLENNY: Sure.
9  Q. (BY MR. PFANSTIEL) All right. Mr. Irmiter --
10 A. Yes.
11 Q. -- is it your testimony today that the moisture
12 you found in the roof was caused by hail fractures to
13 the roof?
14 A. The hail fractures created the mechanism for
15 the water entry.
16 Q. Okay. Is it your testimony that the hail
17 fractures are the sole cause of the moisture in the roof
18 membrane?
19 A. Yes.
20 Q. And that the alligator cracking had no -- was
21 not a causal reason for that.
22 A. Yes.
23 Q. And part of that opinion is based on your
24 observations on the site, and part of that is because of
25 the -- the facts as related to you by the building owner

### Page 196

1  as to when the leaking started.
2  A. Yes, from the investigation; and, also, you
3  know, had the alligator cracking been the cause of the
4  damages, I already testified the damages would be more
5  catastrophic than this. And, also, the infrared, and
6  even the moisture readings, would have been much less
7  localized as -- as we took -- it would have been more
8  widespread.
9  Q. Okay.
10 A. Yeah.
11 Q. The -- You're assuming, though, that the
12 alligator cracking would all deteriorate and -- and --
13 at the same -- at the same --
14     MR. PFANSTIEL: Strike that.
15 Q. (BY MR. PFANSTIEL) And -- And you did find
16 blisters on the roof?
17 A. I found one blister, and that was up on the
18 parapet wall; and I indicated that it was a bubble on
19 that, that it had been indented by hail. I did not find
20 any other blistering.
21 Q. Okay. Because 3.11, you say, "Blisters exist
22 on the roof."
23 A. Hmm. Probably a misprint.
24 Q. Okay. So your testimony today is there's only
25 one blister.

### Page 197

1  A. Oh, okay. I have to put this in context.
2  (Looking at report.) Yeah. What -- What I'm referring
3  to here is we did not see blisters in the way that
4  Vertex is describing what a blister is. That would be a
5  different phenomena. A blister would be indicative of
6  improper mix of the material, improper installation or
7  installing over wet materials; and it evidences itself
8  more as a bubble, a lifting up, that creates a blister.
9  That's what I'm pointing is.
10     So the blisters that we're seeing are --
11 What I'm calling a blister and what he's calling a
12 blister are probably two different things. There are
13 indications of delaminated elastomeric coating that has
14 blistered. That's a coating on top, and that's most
15 likely indicative to poor surface prep; putting that
16 material over dirty --
17 Q. Right.
18 A. -- dirty membrane. That's, really, what's that
19 doing. And that -- So it's two different things.
20 Q. Okay. So --
21 A. Yeah.
22 Q. But as I understand your testimony today,
23 effectively, you were able to identify moisture in the
24 roof by the Tramex and infrared technologies; and then
25 you also found some fractures, and you did a -- you did